IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| O'S VERSATILITY CONSTRUCTION LLC<br>4408 Brooks Road<br>Cleveland, Ohio  44105,<br><br>      Plaintiff,<br><br>v.<br><br>CLEVELAND CONSTRUCTION, INC.<br>8620 Tyler Boulevard<br>Mentor, Ohio  44060,<br><br>      and<br><br>JAMES TOLBERT<br>1269 Briarhill Drive<br>Akron, Ohio  44333,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.<br><br><br><br><br><br>**COMPLAINT**<br><br>(Jury Demand Endorsed Hereon) |

Now comes Plaintiff, O's Versatility Construction LLC ("Plaintiff" or "Versatility"), for its complaint against Defendant Cleveland Construction, Inc. ("CCI") and Defendant James Tolbert ("Tolbert") (CCI and Tolbert collectively, "Defendants") and hereby states the following:

## THE PARTIES

1. O's Versatility Construction LLC ("Versatility" or "Plaintiff") is a limited liability company with its primary place of business located at 4408 Brooks Road, Cleveland, Ohio 44105.

2. Defendant Cleveland Construction, Inc. is a company with its primary place of business located at 8620 Tyler Blvd., Mentor, Ohio 44060.

3. Upon information and belief, Defendant James Tolbert is an individual who resides at 1269 Briarhill Drive, Akron, Ohio 44333.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction over the action under 28 U.S.C. § 1331, because this action alleges violations of 42 U.S.C. § 1981. The Court has supplemental jurisdiction over the state law causes of action pleaded herein pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this district under 28 U.S.C. § 1391, because the parties reside in this district, do business in this district, and because the construction project at which the events giving rise to the claims occurred in this district.

## FACTS

6. Versatility is a certified minority owned construction company that has been doing business in Cleveland, Ohio, and surrounding communities since 2018.

7. CCI is a construction company that provides construction services, including services of general contractor in commercial construction in the Cleveland area and beyond.

8. CCI was hired as the contractor on a project known as the City Club Apartments – Cleveland, located at 776 Euclid Avenue, Cleveland, Ohio 44103 (the "Project").

9. CCI's on-site Project supervisor was Defendant James Tolbert ("Tolbert").

10. The owner of the Project is CCA CBD Cleveland, LLC, 31700 Middlebelt Road, Suite 140, Farmington Hills, Michigan 48334 (the "Owner").

11. CCI hired Versatility as a subcontractor on the Project.

12. CCI hired Versatility as a minority owned business to be in compliance with and/or to incur the benefits of Cleveland Area Business Code.

13. Versatility was the only certified minority owned business on the Project.

14. Versatility and CCI entered into a subcontract for Versatility to perform internal painting on the Project ("Subcontract").

15. CCI is in possession of a complete set of the Subcontract, Subcontract Documents, and Contract Documents as those items are defined within the Subcontract.

16. As a minority owned company, the Versatility workers on the Project were African American, and Versatility's on-site supervisor was an African American woman.

17. Versatility's workers experienced severe and pervasive racial insults and discrimination throughout their time on the Project.

18. CCI's on-site supervisor, Tolbert, was present at the Project on a daily basis along with other CCI workers.

19. This discriminatory conduct culminated on October 24, 2023, with the discovery by a Versatility worker of a cardboard cutout at the Project of a human figure hanging from a noose with the message "my motivation to work" written on one side. An accurate photograph of the figure located on the Project is below and made part of this paragraph.

 

20. The human figure hanging from a noose depicted above was on the Project for multiple days before its discovery by Versatility workers and was allowed to exist by Defendants.

21. Beginning with their first day at the Project and leading up to the discovery of the human figure hanging from a noose, Versatility's workers were subjected to racial slurs and insults, both overt and subtle, intimidation, and disparate treatment as compared to Caucasian workers from other companies who were on the Project. For instance,

    a. Upon their arrival on the Project, Versatility workers heard comments, "Oh no, we got black people here," and "How did they get the contract?"

    b. When Versatility workers used the outside elevator called a buck hoist, they would often be made to wait for an inordinate amount of time and would hear comments like "Let the niggers walk," "Let their black asses walk," and/or "Where the fuck do those niggers think they are going" while they waited.

    c. When Versatility workers complained about waiting, CCI's on-site supervisor, Tolbert, told them that the buck hoist was not operational, when the Versatility workers could see and hear that it was in operation.

    d. Versatility workers heard themselves referred to as "those niggers" on a regular basis.

    e. Versatility workers were told racial "jokes" to see if they would react.

    f.  Racist slurs were written in the porta potties on the Project. An accurate photograph of racist graffiti written in one of the porta potties on the Project is below and is made part of this paragraph.



    g.  Versatility workers were not allowed by CCI's supervisor, Tolbert, to create a lunch station within the building or to listen to the music of their choosing while Caucasian workers from other companies, including CCI, were allowed to do so,

    h.  Defendants strictly enforced clothing and PPI regulations against Versatility workers, but not against non-African American workers.

    i.  When Versatility workers would leave the building, comments would be made that they must be leaving to "smoke weed" in furtherance of racial stereotypes.

    j.  Groups of Caucasian workers would stare and snicker at them.

22. The CCI supervisor, Tolbert, and other CCI workers on the Project were both present for and engaged in portions of the conduct described above.

23. Defendants knew or should have known of the racial harassment taking place on the Project and took no steps to stem the racial comments and discrimination experienced by Versatility workers.

5

24. Versatility workers performed their duties on the Project in a timely and workmanlike manner in compliance with the Subcontract and often above and beyond contract requirements.

25. Despite this, Defendants engaged in a purposeful and racially motivated plan to drive Versatility off of the Project.

26. In addition to participating in and fostering a racially hostile environment, Defendants made efforts to sabotage Versatility's work and to slow Versatility's progress while at the same time falsely accusing Versatility of performing below quality work and falling behind schedule.

27. On more than one occasion, Versatility informed Defendants that units were ready for inspection, but Defendants declined to conduct the inspection until the next day.

28. The next day, when the inspections took place, damage and imperfections caused by others were present that were not present the day before when Versatility indicated that it was ready for inspection.

29. Versatility also experienced the theft of their equipment from the Project.

30. At the same time that Defendants were purposely delaying and sabotaging Versatility's work, Defendants were informing Versatility that delays would result in Versatility being removed from the Project.

31. Upon Versatility's arrival on the Project, CCI's on-site supervisor, Tolbert, expressed to Versatility's supervisor his belief that Versatility would not be able to handle the job.

32. CCI's on-site supervisor, Tolbert, was heard to say on more than one occasion that Defendants were trying to get Versatility off the Project and that they did not want them on the Project.

33. On one occasion, a Versatility worker—who the CCI supervisor, Tolbert, did not see—overheard Tolbert tell another CCI worker, while using a racial slur, that he did not want Versatility workers on the Project and could not wait to get rid of them.

34. A Versatility worker who was at CCI's offices for his orientation program was asked who he was working for. When the Versatility worker said that he was a painter with Versatility, the individual, who was Caucasian, said, "We'll see how long that will last. We'll be taking over that contract."

35. On or about October 13, 2023, Defendants began suggesting to Versatility that it was not going to be able to perform in a timely fashion with its current workers and that Versatility must hire painters that Defendants were familiar with to help finish the job.

36. The painters Defendants pressured Versatility to hire were non-African American.

37. CCI insisted that Versatility hire the substitute painters at an hourly rate greater than Versatility's own workers.

38. On or about October 12, 2023, Versatility's owner complained to CCI's vice president about their work being sabotaged, about the existence of racial discrimination taking place on the Project, and about his workers not wanting to return as a result.

39. CCI's vice president discounted Versatility's complaint out of hand and took no action to investigate or curtail the discrimination taking place on the Project in response to Versatility's complaint.

40. Instead, Defendants retaliated against Versatility by sending a default letter to Versatility 11 days later on or about October 23, 2023.

41. The allegations in the default letter were false and/or caused by Defendants' own attempts to delay and sabotage Versatility's performance.

42. This hostile working environment reached a tipping point upon the discovery of the human figure hanging from a noose and created an objectively and subjectively intolerable working environment.

43. Based upon the human figure hanging from a noose and the pervasive discriminatory remarks, graffiti and conduct leading up to it, Versatility's workers experienced a very real threat of physical danger and did not believe that they could safely remain on the Project.

44. Versatility's workers were often at the Project in the early hours when it was dark, when there were not many people around, and there were fall hazards. Based upon all of the above, many of Versatility's workers would not return to the Project for fear that they could and would be physically harmed.

45. Versatility workers called the police, packed up their tools, and informed Defendants of their intended departure.

46. Upon learning of the impending police investigation, Defendants instructed other workers to immediately remove the racist graffiti in the porta potties.

47. When Versatility's workers were loading their equipment on the buck hoist to leave the Project, a CCI worker said, "Look at the niggers go."

48. Several of Versatility's workers, either permanently or temporarily, left the construction industry entirely based upon their experiences at the Project.

49. When Versatility did not return to the Project based upon the above described acts of discrimination, CCI retaliated further by declaring Versatility to be in default of the Subcontract and then filed an arbitration claim against Versatility in Florida for an alleged breach of the Subcontract.

## COUNT I
## 42 U.S.C. § 1981

50. Versatility incorporates the allegations of the preceding paragraphs as if fully rewritten.

51. Versatility has standing to bring a claim under 42 U.S.C. § 1981 as a minority owned company.

52. The actions and omissions of Defendants deprived Versatility of the equal rights conferred by 42 U.S.C. § 1981.

53. Defendants violated 42 U.S.C. § 1981 by, among other things, impairing Versatility's ability to enjoy, enforce, perform, modify, and terminate the benefits, privileges, terms and conditions of the contractual relationship created by the Subcontract.

54. Defendants, through their actions and omissions, created a hostile work environment that made Versatility's continued work on the Project impossible and unsafe.

55. Versatility's workers were exposed to unwelcome harassment based upon race.

56. The racial harassment was so severe and/or pervasive that it had the purpose and effect of interfering with Versatility's work performance and creating an unsafe, intimidating, hostile, offensive, and/or abusive working environment.

57. CCI's management and/or supervising personnel, including but not limited to Tolbert, participated in, tolerated, condoned, and knew or should have known of the situation.

58. Defendants took no actions to ameliorate the hostile work environment they created, participated in, fostered, and/or knowingly allowed to exist.

59. Defendants' acts and omissions were purposeful, intentional, conducted with an evil and/or discriminatory nature and/or with intent and/or with reckless disregard or callous indifference to Versatility's federally protected rights.

60. Defendants constructively discharged Versatility by deliberately creating intolerable working conditions with the intention of forcing Versatility to quit.

61. Defendants' actions and omissions were so severe that Versatility and any reasonable company would feel compelled to resign.

62. Indeed, Versatility's workers were no longer willing to work on the Project for fear of their physical safety.

63. Versatility would have performed and enjoyed the benefits of the Subcontract but for Defendants' violations of 42 U.S.C. § 1981.

64. Versatility's costs on the Project were increased due to Defendants' discriminatory conduct.

65. Versatility's ability to perform future business has been compromised by the economic and reputational damage caused by Defendants and the departure of workers.

66. As a proximate result of Defendants' violations of 42 U.S.C. § 1981, Versatility suffered consequential, economic, reputational, and contractual damages all in excess of $75,000.00.

## COUNT II
**Retaliation under 42 U.S.C. § 1981,  
Title VII, and Ohio's Civil Rights Act**

67. Versatility incorporates the allegations of the preceding paragraphs as if fully rewritten.

68. Defendants retaliated against Versatility for complaining about the racial discrimination being experienced by its workers on the Project by declaring Versatility to be in default of the Subcontract on two occasions and by bringing an arbitration claim against Versatility.

69. Versatility's ability to perform future business has been compromised by the economic and reputational damage caused by Defendants and the departure of workers.

70. As a proximate result, Versatility suffered consequential, economic, reputational, and contractual damages all in excess of $75,000.00.

## COUNT III
### Breach of Contract

71. Versatility incorporates the allegations of the preceding paragraphs as if fully rewritten.

72. Versatility performed under the Subcontract.

73. CCI had an express and/or implied contractual duty to maintain a safe working environment for Versatility employees.

74. CCI had an express and/or implied contractual duty to maintain a working environment free of racial discrimination, harassment, and abuse.

75. CCI had a contractual duty, express or implied, to refrain from taking actions to subvert and/or make impossible Versatility's ability to complete the Subcontract.

76. CCI breached the Subcontract with Versatility by, among other things, engaging in racially motivated discriminatory acts and omissions; sabotaging Versatility's work; purposely delaying Versatility's work; creating, nurturing, and/or allowing a hostile work environment; constructively discharging Versatility; and/or retaliating against Versatility for complaining about experiencing racial discrimination on the Project.

77. CCI further breached the Subcontract by failing to pay Versatility for work performed.

78. As a direct and proximate result of CCI's breaches of the Subcontract, Versatility suffered losses in excess of $75,000.00.

## COUNT IV
### Negligence

79. Versatility incorporates the allegations of the preceding paragraphs as if fully rewritten.

80. CCI had a duty to maintain a safe working environment for Versatility employees.

81. CCI had a duty to maintain a working environment free of racial discrimination, harassment, and abuse.

82. CCI breached its duties by, among other things, engaging in racially motivated discriminatory acts and omissions; sabotaging Versatility's work; purposely delaying Versatility's work; creating, nurturing, and/or allowing a hostile work environment; constructively discharging Versatility; and/or retaliating against Versatility for complaining about experiencing racial discrimination on the Project.

83. As a direct and proximate result of CCI's breaches of the Subcontract, Versatility suffered consequential, economic, reputational, and contractual losses all in excess of $75,000.00.

## DEMAND FOR JURY TRIAL

Versatility hereby requests a trial by jury with respect to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Versatility requests that judgment be entered in its favor and against Defendant as follows:

    A. That Versatility be awarded compensatory and/or economic damages incurred as a direct and/or proximate result of Defendants' discriminatory practices, breach of contract, and/or negligence.

  B. That Versatility be awarded punitive damages, by reason of Defendants' willful and malicious acts, in an amount sufficient to deter Defendants and others from engaging in similar conduct in the future.

  C. That Versatility be awarded reasonable attorneys' fees and costs.

  D. That this Court order such other relief in Versatility's favor as may be just and required under the circumstances of this case.

    Respectfully submitted,

    */s/Charles A. Bowers*
    Charles A. Bowers, Esq. (OH Bar #0064075)
    TAFT STETTINIUS & HOLLISTER LLP
    200 Public Square, Suite 3500
    Cleveland, Ohio  44114
    Telephone:  (216) 241-2838
    Facsimile:  (216) 241-3707
    Email:  cbowers@taftlaw.com

    *Attorney for Plaintiff,*
    *O's Versatility Construction LLC*